

FILED

DEC - 1 2007

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Case No. 07-28444-A-11 |
| | ) | |
| | ) | Docket Control No. WFH-2 |
| OCCMEDS BILLING SERVICES, | ) | |
| INC., | ) | Date: November 30, 2007 |
| | ) | Time: 11:30 a.m. |
| | ) | |
| Debtor in Possession. | ) | |
| | ) | |
| _____ | ) | |

**MEMORANDUM**

OccMeds Billing Services, Inc., (OccMeds) seeks authority to
use the cash collateral of Bridge Healthcare Finance, LLC,
(Bridge) and Murphy Austin Adams Schoenfeld, LLP (Murphy Austin).
Bridge, but not Murphy Austin, objects to the proposed use of
cash collateral.

Since 1982, OccMeds has operated a medical billing company
in Roseville, California.  Its services are offered to doctors
and clinics treating patients covered by workers' compensation
insurance.  Until recently, OccMeds arranged for the purchase of
medicines by doctors or clinics who would dispense the medicines
directly to their patients, eliminating the patient's need to
take a prescription to a pharmacy.

128

1  Upon the dispensing of the medicine to a patient, a

2  receivable would arise owed by the patient's worker's

3  compensation insurer to OccMeds.  OccMeds would, at the time of

4  dispensing of the drug, advance a percentage of the invoice

5  amount to the doctor or clinic dispensing the drug.  OccMeds

6  would handle all billing and collection procedures and would

7  submit invoices to the various workers compensation insurers.

8  Invoices would be paid directly to OccMeds.  When the receivable

9  was actually paid by the insurer, OccMeds would deduct the cost

10  of the medicine dispensed and the amount of the advance

11  previously paid to the doctor, and then would make a second

12  payment to the dispensing doctor or clinic representing a

13  percentage of the "profit."  OccMeds would retain a percentage of

14  the "profit" as its fee for processing invoices and advancing

15  funds.

16      This business model required OccMeds to advance funds before

17  OccMeds received payment from the insurance companies obligated

18  to pay for the medicine.  In some cases, OccMeds was also

19  required to pay for the medicine dispensed before the cost was

20  reimbursed by the insurance companies.  This created cash flow

21  difficulties that ultimately lead, in part, to the filing of this

22  case.  To avoid these difficulties, OccMeds is modifying its

23  business model.

24      Under its modified business model, OccMeds will continue to

25  pay for medicines delivered to doctors and clinics, but OccMeds

26  will no longer advance funds to these doctors or clinics upon

27  their sale of medicine to patients.  Instead, the receivables

28  will be owned by the doctors and clinics and OccMeds will collect

1  the receivable as agent for the doctors and clinics.  OccMeds

2  will deduct the cost of medicine and a service fee, and will

3  remit the remainder to its doctor and clinic clients.  It is

4  hoped that this modification will reduce OccMeds' capital outlay

5  for ongoing operations.

6  OccMeds' primary asset is its accounts receivable and

7  payment rights.  When the petition was filed, its accounts

8  receivable totaled $2,471,983.  However, OccMeds estimates that

9  only 60%, or approximately $1,247,130, is collectible.

10  The low rate of anticipated collection leads the court to

11  conclude that a sizeable amount of these receivables are past due

12  and will require litigation to collect.[1]

13  OccMeds also claims that it is owed monies arising from

14  transactions in which OccMeds paid for medicine, and advanced

15  monies to doctor groups or pharmacies, based on receivables that

16  were later rejected by the underlying insurance companies.

17  OccMeds is owed $1,324,021 for these over-advances, and predicts

18  that only 20-30% of them, a maximum of $397,206, will be

19  collectible.[2]

20  OccMeds further maintains that it is entitled to recover the

21  cost of the medicine from the individual patients when a claim is

22

23  [1]  This conclusion is buttressed by the fact that Exhibit
24  C to the original motion indicates that of the $2,471,983,
   $2,400,429 is owed by four clients who also owe $1,304,725 of the
25  $1,324,021 in over-advances made by OccMeds.  These over-advances
   are discussed below.

26  [2]  OccMeds' original motion gave the 20-30% estimate but
27  indicated this estimate would produce a $417,013 recovery.  This
   is actually 31.5% of the total amount.  The amount given above is
28  30% of the total.

-3-

1  disallowed by an insurer.  OccMeds has a gross amount of

2  $3,482,540 in claims against patients, and has assigned these

3  claims to a collection agency.  OccMeds estimates that only 20%,

4  or $487,555, is collectible.

5      Thus, when the petition was filed, OccMeds had total

6  receivables and rights to payment of $7,278,544, but of this

7  amount, it judged that only $2,151,699[3] was collectible.  OccMeds

8  acknowledged at an earlier cash collateral hearing that

9  substantial litigation and collection expense would be incurred

10  to make these collections.

11      OccMeds has three significant secured creditors with

12  interests in these receivables and rights to payment.

13      Murphy Austin holds a judgment lien to secure a claim in the

14  amount of approximately $131,000.  Murphy Austin's judicial lien

15  is in first priority position.

16      Bridge asserts a second priority blanket lien on all of

17  OccMed's assets, including accounts receivable and payment

18  rights, to secure a claim in the approximate amount of

19  $1,351,000.

20      While Bridge is also secured by all of OccMeds' other

21  assets, the motion concedes that its tangible assets have

22  negligible value.  The one other asset with material value is a

23  proprietary billing system which is comprised of computer

24  software.  OccMeds believes that this software has a value of

25  $250,000.

26

27  _____

28      [3]    After the $19,807 adjustment made in footnote 2, this
total is reduced further to $2,131,891.

-4-

1    The court, however, doubts this valuation, particularly if

2    the estate is liquidated and does not continue business

3    operations.   The record does not convince the court that this

4    idiosyncratic piece of software will have a material value to a

5    foreclosing creditor.   For purposes of evaluating whether Bridge

6    will be adequately protected if OccMeds uses its cash collateral,

7    the court assigns this asset no value.

8    On August 27, 2007, Stan Leavitt and Gerald Ray filed a

9    financing statement with the California Secretary of State.

10   OccMeds acknowledges that Mr. Leavitt and Mr. Ray are owed

11   approximately $128,320, and that their claim is secured by its

12   accounts receivable and other assets.   OccMeds believes, however,

13   that their lien is junior to the liens of Murphy Austin and

14   Bridge, and that their lien is not validly perfected.

15   Excluding the Leavitt-Ray lien, the secured claims total

16   approximately $1,482,000, while the allegedly collectible

17   receivables and rights to payment total $2,131,891.   Given the

18   surplus of receivables, and given OccMeds' willingness to give

19   Bridge and Murphy Austin a replacement lien on post-petition

20   receivables, OccMeds maintains that it has adequately protected

21   their interests in its cash and therefore the court should permit

22   it to use that cash for its operations.

23   11 U.S.C. § 363(c) authorizes the use of cash collateral as

24   follows:

25       (2) The trustee may not use, sell, or lease cash
           collateral under paragraph (1) of this subsection
26       unless –
               (A) each entity that has an interest in such cash
27             collateral consents; or
               (B) the court, after notice and a hearing,
28             authorizes such use, sale, or lease in accordance

-5-

with the provisions of this section.
(3) Any hearing under paragraph (2)(B) of this
subsection may be a preliminary hearing or may be
consolidated with a hearing under subsection (e) of
this section, but shall be scheduled in accordance with
the needs of the debtor.  If the hearing under
paragraph (2)(B) of this subsection is a preliminary
hearing, the court may authorize such use, sale, or
lease only if there is a reasonable likelihood that the
trustee will prevail at the final hearing under
subsection (e) of this section.  The court shall act
promptly on any request for authorization under
paragraph (2)(B) of this subsection.

11 U.S.C. § 363(e) provides as follows:

(e) Notwithstanding any other provision of this
section, at any time, on request of an entity that has
an interest in property used, sold, or leased, or
proposed to be used, sold, or leased, by the trustee,
the court, with or without a hearing, shall prohibit or
condition such use, sale, or lease as is necessary to
provide adequate protection of such interest.  This
subsection also applies to property that is subject to
any unexpired lease of personal property (to the
exclusion of such property being subject to an order to
grant relief from the stay under section 362.

The court concludes that OccMeds will be unable to

adequately protect the interests of the secured creditors if it

uses their cash collateral.

First, OccMeds' assertion that Bridge and Murphy Austin are

over-secured is arguable at best.  OccMeds finds itself in

financial difficulty in large part because it advanced

substantial sums to four clients in exchange for receivables

(approximately $1,324,021) that have proven uncollectible.

Further, these same clients owe most of the "open" receivables

that were due on the petition date.[4]  It is incongruous to expect

that, when litigation is commenced against these clients to

collect $1,304,725 in over-advances, they will promptly and

---

[4]    See footnote 1.

-6-

1  willingly pay the $2,400,429 in open receivables to OccMeds.

2      Viewed charitably, the receivables and rights to payment on

3  hand when the petition was filed assure only one thing - a lot of

4  litigation.

5      And, much of that litigation will be against the patients of

6  OccMeds' clients.  OccMeds asserts $3,482,540 in claims against

7  patients.  Given the modest amounts that individual patients

8  undoubtedly owe for prescriptions, one wonders whether the

9  expense associated with litigation (even if it takes place in

10  small claims court) will be worth it.

11      Second, the new business model being instituted by OccMeds

12  has fallen significantly short of producing the receivables it

13  predicted at the beginning of this case.  As noted in the

14  declaration of Scott R. Mitchell, through the week of November

15  19, OccMeds projected the generation of $124,274 in post-petition

16  accounts receivable, but actually generated only $44,371 in such

17  receivables, a negative variance of $79,903.  Moreover, none of

18  these post-petition receivables came from new clients.

19      Third, Bridge is worse off now than at the beginning of the

20  case.

21      Since the petition was filed, OccMeds has collected $197,985

22  of pre-petition accounts receivable.  It began this case with

23  $48,669 of cash.  Thus, OccMeds has collected a total of $246,654

24  of Bridge's cash collateral.

25      OccMeds now has approximately $189,108 of cash on hand and

26  $44,371 of new post-petition accounts receivable, for a total of

27  $233,479.

28      Thus, Bridge is $13,175 ($246,654 minus $233,479) worse off

1 than it was at the beginning of the case.[5]

2     Fourth, not only is OccMeds' new business model producing a

3 reduced level of receivables, there is a substantial question as

4 to whether it creates a receivable in OccMeds' favor.

5     OccMeds does not create an account receivable when it bills

6 a client because payment of its 30-35% fee occurs only if the

7 insurance company or the patient pays OccMed's client.  This may

8 be weeks or even months after the insurance company or patient is

9 billed.  Moreover, because the client owns the account receivable

10 rather than OccMeds, OccMeds has no ability to collect from the

11 patient or the insurance company on its own behalf.

12     Fifth, while OccMeds has a pending settlement with Murphy

13 Austin that will eliminate one-half of its senior lien, the deal

14 requires payment of the remaining $62,622 to Murphy Austin.  This

15 nominally benefits Bridge.  However, payment of the $62,622 will

16 further deplete Bridge's cash collateral.

17     Sixth, OccMeds is also seeking a surcharge against OccMeds

18 pursuant to 11 U.S.C. § 506(c).  If permitted, this will

19 reimburse OccMeds, at the expense of Bridge, for costs associated

20 with the collection of its pre-petition receivables and rights to

21 payment.

22     Central Bank v. Cascade Hydraulics & Utility Service, 815

23 F.2d 546 (9th Cir. 1987), provides the standard for evaluating a

24 request to surcharge a secured creditor's collateral.  A trustee

25 or debtor in possession seeking to surcharge collateral must

26 _____

27     [5]     To the extent Bridge is holding $37,807.33 of cash that
belongs to DSI as DSI maintains, Bridge will be that much more
28 worse off.

-8-

1  establish that the expenses incurred were (1) reasonable; (2)

2  necessary; and (3) beneficial to the secured creditor.  <u>Id</u>. at

3  548.  As explained in <u>In re Debbie Reynolds Hotel & Casino</u>, 255

4  F.3d 1061, 1068 (9th Cir. 2001):

5       "this is not an easy standard to meet. It is the party
         seeking the surcharge that has the burden of showing a
6       'concrete' and 'quantifiable' benefit.  The § 506
         recovery is limited to the amount of the benefit
7       actually proven."

8  The court will not resolve the surcharge motion at this

9  time.  However, it agrees with Bridge's argument that the mere

10  fact that a surcharge is being attempted corroborates Bridge's

11  argument that it is not over-secured and adequately protected.

12       In its motion to use cash collateral, OccMeds has maintained

13  that Bridge is over-secured.  If so, the costs OccMeds incurs

14  collecting pre-petition receivables do not benefit Bridge.

15  Absent the bankruptcy petition, Bridge could direct OccMeds'

16  receivables to itself and, pursuant to the terms of its agreement

17  with OccMeds, add its collection expenses to its claim.  As long

18  as the receivables exceeded the amount owed plus its costs,

19  Bridge would be paid.

20       Hence, in bankruptcy, Bridge is benefitted by OccMeds'

21  collection efforts only if it is under-secured and OccMeds

22  expends resources not subject to Bridge's lien in an effort to

23  collect or preserve Bridge's collateral.  <u>See</u> <u>In re Compton</u>

24  <u>Impressions, Ltd v. Queen City Bank (In re Compton Impressions,</u>

25  <u>Ltd)</u>, 217 F.3d 1256, 1261 (9th Cir. 2000) (denying motion to

26  surcharge because "the [b]anks could have fully recovered the

27  unpaid balance of their loan if they had initially foreclosed on

28  the property").

1    OccMeds has not carried its burden of establishing that it

2  can use its cash while adequately protecting Bridge's interest in

3  that cash.

4    A separate order shall be lodged by counsel for Bridge

5  denying further use of cash collateral.

6  Dated: December 1, 2007 at 11:30 p.m.

7                                      By the Court

8

9                                      _____
                                       Michael S. McManus, Chief Judge
10                                     United States Bankruptcy Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-10-